UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| JOHN WARDIA, | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 2: 11-56-DCR |
| V. | ) ) | |
| JUSTICE AND PUBLIC SAFETY CABINET DEPARTMENT OF JUVENILE JUSTICE, et al., | ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court for consideration of the Motion for Summary Judgment filed by Defendants Justice and Public Safety Cabinet Department of Juvenile Justice ("DJJ") and the Campbell County Regional Juvenile Detention Center. [Record No. 18] The defendants argue that no genuine issue of material fact remains with respect to Plaintiff John Wardia's claims of disability discrimination and wrongful discharge. The Court agrees and will grant the defendants' motion for the reasons explained more fully below.

**I.**

Wardia worked for the DJJ from 2003 to 2009. When his employment ended, he held the position of Youth Worker II at the Campbell County Regional Juvenile Detention Center.[1]

---

[1] The parties have indicated that the only real difference between Youth Worker I and Youth Worker II positions is the rate of pay. For simplicity's sake, the term "Youth Worker" will be used in this Opinion to refer to Wardia's last position at the DJJ.

-1-

Wardia underwent neck surgery in 2008. Before and after the surgery, he was restricted by his doctors from certain activities, including physical restraint of juveniles. To accommodate that restriction, Wardia was given a temporary, light-duty assignment in the detention center's control room. Ordinarily, Youth Workers work in the control room on a rotating basis.

On October 18, 2009, Wardia was placed on leave without pay. The following September, he informed the DJJ that his medical condition had not changed, and he asked to be permanently reassigned to the control room. [Record No. 18-4, p. 53] On January 4, 2011, he was notified that his employment with DJJ was considered resigned pursuant to title 101, chapter 2:102, of the Kentucky Administrative Regulations ("KAR") because he had exhausted all of his available leave and was unable to return to full duty.[2]  [Record No. 18-2] After unsuccessfully appealing this resignation to the Kentucky Personnel Board, Wardia filed a charge of discrimination with the Equal Employment Opportunity Commission and received notice of his right to sue. [Record No. 20-1]

---

[2] Section 2, subsection (g), of 101 KAR 2:102 provides:

An employee shall be considered to have resigned if he:

1. Has been on one (1) year continuous sick leave without pay;
2. Has been requested by the appointing authority in writing to return to work at least ten (10) days prior to the expiration of sick leave;
3. Is unable to return to his former position;
4. Has been given priority consideration by the appointing authority for a vacant, budgeted position with the same agency, for which he is qualified and is capable of performing its essential functions with or without reasonable accommodation; and
5. Has not been placed by the appointing authority in a vacant position.

Wardia then filed the present lawsuit in Campbell Circuit Court, alleging violations of the Americans with Disabilities Act ("ADA") and Kentucky Civil Rights Act ("KCRA"), as well as wrongful discharge. [*See* Record No. 1-1] The defendants timely removed the action to this Court. [Record No. 1] Having completed discovery, they now seek summary judgment.

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* (c)(1). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, the nonmoving party must establish the existence of a genuine issue of material fact as to each essential element of his case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A. Disability Discrimination

It is undisputed that Wardia is no longer a Youth Worker because of his inability to perform restraints. "When an employer admits that it relied upon a disability in making an adverse employment decision," a plaintiff who alleges discrimination under the ADA must make a prima facie showing that he "(1) has a disability, and (2) is otherwise qualified for the position despite the disability either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 724 (6th Cir. 2000) (internal quotation

marks omitted). Likewise, to state a prima facie case of disability discrimination under the KCRA, a plaintiff must establish "(1) that he had a disability as that term is used under the [KCRA]; (2) that he was 'otherwise qualified' to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability." *Hallahan v. Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004). If a plaintiff can make this prima facie showing, the burden then shifts to the employer to "prov[e] that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship on the employer." *Hoskins*, 227 F.3d at 724 (internal quotation marks omitted); *see Hallahan*, 138 S.W.3d at 706 n.5.

In this action, the defendants do not dispute that Wardia is disabled. Instead, they contend that he is not "otherwise qualified" for the position of Youth Worker II. Specifically, the parties dispute: (1) whether physical restraint of juveniles is an essential function of the Youth Worker position and (2) if so, whether Wardia's proposed accommodation — *i.e.*, being permanently reassigned to the control room — is reasonable. The Sixth Circuit addressed both questions, under similar facts, in *Hoskins*.

### 1. Essential Function

The plaintiff in *Hoskins* was a deputy sheriff (a "deputy one") who became unable to perform physical restraints of inmates due to an injury. *See* 227 F.3d at 722, 724. As set forth in the written job description for a deputy one, the position entailed the following:

> [P]erforms routine security and custody activities. Assists in maintaining and enforcing procedures and regulations to ensure security is maintained at the jail and satellite facilities. Distributes meals, bedding and supplies to inmates. Screens visitors, issues passes and ensures visitation regulations are maintained.

> Transports inmates to authorized facilities, ensuring that security procedures are followed. Physically restrains individuals as necessary.

*Id.* at 726. A more specific list of duties included:

> driving the transportation vehicle and supervising the conduct of inmates during transportation to authorized facilities; supervising inmates being held at the courthouse and awaiting court appearances; guarding inmates during courtroom appearances to ensure that security is maintained; supervising the activities of inmates assigned to all jail facilities; searching inmates; and ensuring that security is maintained at jail facilities.

*Id.* The chief of staff of the sheriff's department, Major Quisenberry, elaborated on these written descriptions of the deputy one position. He testified:

> The deputy one is the deputy that's the entry level position, and it's the one person who has the closest individual contact with prisoners or inmates in the Oakland County Jail. They're the first line-of-defense, I suppose, with the prisoner, whether it be from the time they get up in the morning with their feedings until they go to bed at night. It's generally the deputy ones who have the day-to-day contact with prisoners. And the opportunity and at times the necessity that they have to have physical contact with those inmates I think falls within this physically restrain individuals as necessary line [in the job description] that we're referring to.

*Id.* at 727.

Hoskins argued that physical restraints were not an essential part of her job because the need to physically restrain inmates rarely arose. *Id.* She pointed out that "in her entire career as a deputy one she had only one physical altercation with an inmate." *Id.* The court rejected this argument. Because the purpose of the deputy one position was "to supervise inmates and maintain security," the court explained, a situation requiring physical restraint could arise at any time. "Although a deputy one may be required physically to restrain inmates only infrequently, the potential for physical confrontation with inmates exists on a daily basis, and the consequence

of failing to require a deputy to perform this function when the occasion arises could be a serious threat to security." *Id.* Therefore, physically restraining inmates was an essential function of the deputy one position. *See id.* The same reasoning applies here.

Youth Workers are responsible for supervising juveniles accused of violent crimes, so the position undoubtedly entails a constant "potential for physical confrontation."[3] *Id.* The written job description indicates that on average, fifty percent of a Youth Worker's time is spent "[s]upervising and monitor[ing] activities of DJJ juveniles" and "assist[ing] juveniles in interpersonal skill development." [Record No. 18-3, p. 1] Youth Workers are also charged with "ensur[ing] safety of juveniles." [*Id.*] According to Mark Cummins, Superintendent II at the Campbell County Regional Youth Detention Center, physically restraining juveniles is an essential function of the Youth Worker position because Youth Workers "have to maintain safety and security of both staff and residents and the facility." [Record No. 18-11, p. 18] In other words, a Youth Worker's primary purpose is "to supervise [juveniles] and to maintain security." *Hoskins*, 227 F.3d at 727. Moreover, the job description expressly states, in a list of "essential functions," that a Youth Worker "[m]ay be required to restrain out of control juveniles." [Record No. 18-3, p. 2]

Wardia's own testimony also indicates that physical restraints are essential to the Youth Worker position. Wardia testified that he was given extensive training on restraints, including a three-month "Youth Worker academy" where he learned "[s]afe physical management skills," or "[h]ow to control a youth . . . if they're escalating." [Record No. 18-4, pp. 11-12] He also

---

[3] Wardia testified that during his employment as a Youth Worker, he encountered juveniles charged with murder. [Record No. 18-4, p. 13]

acknowledged that he had been involved in more than one restraint during his employment with the DJJ. [*Id.*, p. 12] *Cf. Hoskins*, 227 F.3d at 727 (plaintiff "had only one physical alteration with an inmate" during her career).

Nevertheless, Wardia attempts to distinguish *Hoskins* by arguing that the Sixth Circuit's conclusion as to whether restraints were essential in that case turned on inmates' and deputies' "constant proximity in a public setting and in the public's presence." [Record No. 20, p. 14] He provides no citation in support of this assertion, however, and a review of *Hoskins* reveals that the Sixth Circuit did not emphasize or even mention proximity to the public as a specific concern underlying its decision. *See* 227 F.3d at 726-28. Rather, the court observed generally that "taken as a whole," the evidence showed "that the deputy one position exists to supervise inmates and to maintain security." *Id.* at 727. Nor did Major Quisenberry, upon whose testimony the court relied, indicate that the ability to perform restraints was essential for public-safety reasons. Instead, his testimony focused instead on the close proximity between deputies and inmates. *See id.* ("The deputy one . . . [is] the one person who has the closest individual contact with prisoners in the Oakland County Jail. . . . They're the first line-of-defense . . . with the prisoner . . . . It's generally the deputy ones who have the day-to-day contact with prisoners."). In short, nothing suggests that *Hoskins* is distinguishable on this ground.

Based on the evidence presented in this case, the Court concludes that physically restraining juveniles is an essential function of the Youth Worker position. As in *Hoskins*, "the consequences of failing to require a [Youth Worker] to perform this function when the occasion arises could be a serious threat to security". The fact that the occasion arises "only infrequently"

does not diminish the danger. *Id.* The next question, then, is whether Wardia has proposed a reasonable accommodation.

### 2. Reasonable Accommodation

The accommodation requested by Wardia was either permanent reassignment to the control room or an exchange of positions with the control room employee if an altercation arose. [*See* Record No. 18-4, pp. 33-34, 53] However, as the Sixth Circuit explained in *Hoskins*, "[r]easonable accommodation may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations.'" 227 F.3d at 728 (quoting 42 U.S.C. § 12111(9)(B)). An employee who seeks a reasonable accommodation "'must establish that a "reasonable" accommodation is possible, and bears a traditional burden of proof that [he] is qualified for the position with such reasonable accommodation. If the plaintiff establishes that a reasonable accommodation is possible,'" the burden shifts to the employer to prove that the proposed accommodation "'would impose an undue hardship.'" *Id.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 n.12 (6th Cir. 1996)).

An accommodation is not reasonable if it would require the employer to "shift[] an essential job function onto others." *Id.* at 729. Nor is an employer "obligated to create a position not then in existence" in order to accommodate a disabled employee. *Id.* A request to convert a rotating position into a permanent full-time job, the *Hoskins* court concluded, falls under the latter rule. *Id.* at 730.

The plaintiff in *Hoskins* proposed that she be permanently reassigned to the control booth, which was a rotating position that involved no contact with inmates. *See id.* at 729-30. In the control booth, Hoskins would have been "primarily responsible for operating the control panel so as to permit officers to enter and leave cell blocks."[4] *Id.* at 729. [*Cf.* Record No. 18-11, pp. 28-29 (testimony of Mark Cummins that Wardia's control-room duties were "to document, watch the monitors, and . . . let people in and out of the building, monitor activities")] The defendants argued that such a reassignment was not reasonable. The court agreed that Hoskins' request — "to be assigned to a rotating-type job on a permanent basis" — "would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one." *Hoskins*, 227 F.3d at 730. Since the law is clear that "an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so," the court held, Hoskins had failed to show that her proposed accommodation was reasonable. *Id.*; *see also Wymer v. JH Props., Inc.*, 50 S.W.3d 195, 200 (Ky. 2001) ("Reasonable accommodation does not include creating a new job.").

Like Hoskins, Wardia has failed to demonstrate that permanently reassigning him to the control room is a reasonable accommodation.[5] He does not dispute that working in the control room is merely a part of a Youth Worker's duties, as opposed to a separate position. [*See* Record No. 18-4, pp. 18-19 (acknowledging that "[n]ot all [Youth Workers] are assigned . . . one job all

---

[4] Hoskins proposed several accommodations; the Sixth Circuit found the control-booth proposal to be her "strongest argument." *Hoskins*, 227 F.3d at 729.

[5] The Court also concludes that allowing Wardia to rotate to the control room in emergency situations is not a feasible alternative in light of the need for quick action by a Youth Worker.

the time" and that working in the control room is one function of a Youth Worker); *id.*, p. 28 (acknowledging that he may have been told that the DJJ was "not creating a permanent position" in the control room)] Instead, his argument focuses on whether it would be an undue hardship for the DJJ to create such a position.[6] He cannot avoid the requirement of showing that his proposed accommodation would be reasonable, however. *See Hoskins*, 227 F.3d at 728.

As the Sixth Circuit noted in *Hoskins*, "[i]t is well established . . . that an employer is not obligated to create a position not then in existence." *Id.* at 729. Here, Wardia seeks to have a rotating job converted into a permanent position to accommodate his disability. *See id.* at 730. Because this proposed accommodation is the equivalent of creating a new job, it is not reasonable. *See id.* As a result, Wardia's ADA and KCRA claims cannot survive summary judgment.

### B. Wrongful Discharge

Wardia did not respond to the defendants' argument with respect to his claim of wrongful discharge. This claim is premised on the "clear public policies" set forth in state and federal law against employment discrimination on the basis of disability. [Record No. 1-1, p. 7 ¶ 33] As

---

[6] Wardia presents an affidavit from a former DJJ employee, Mahannare Harris, who avers that following a hand injury that resulted in a permanent restriction against performing restraints, "Mark Cummins offered to allow [her] to take a position in the control room on 3rd shift, on a permanent basis." [Record No. 20-2, p. 1] Harris states that she declined the offer because she was unable to work third shift. [*Id.*, p. 2] The defendants deny that Harris was "offered a position in the Control Room on a 'permanent basis.'" [Record No. 6, p. 5] They maintain that Harris was offered the same temporary light-duty assignment Wardia received. [*Id.* (citing Record No. 23-3 (memo approving Harris' request for light duty))] Even if Harris was offered such an opportunity, however, there is still no evidence that a permanent control-room position has ever existed. Any factual dispute arising from Harris' affidavit is therefore not a material one.

explained above, however, Wardia has not made a prima facie showing that he was subjected to such discrimination. Therefore, his wrongful-discharge claim also fails.

### III.

Wardia's claims cannot survive summary judgment in light of *Hoskins*. Performing physical restraints of juveniles is an essential function of the Youth Worker position. Furthermore, Wardia's proposed accommodation is not reasonable. Accordingly, it is hereby

**ORDERED** that the Motion for Summary Judgment filed by Defendants Justice and Public Safety Cabinet Department of Juvenile Justice and Campbell County Regional Juvenile Detention Center [Record No. 18] is **GRANTED**. All claims against the defendants are **DISMISSED**, with prejudice.

It is further **ORDERED** that the trial of this matter previously scheduled to begin on April 23, 2012, is **CANCELED**.

A separate judgment will be entered this date.

This 23rd day of March, 2012.

Signed By:
*Danny C. Reeves*  DCR
United States District Judge